May it please the Court, Thomas Fu for Petitioner, Mariela Pascual-Juan. I'd like to reserve three minutes for rebuttal. I'll try to help you, but watch the clock. I appreciate it. The agency here gave one reason for denying Mariela's claim of past persecution, and it's the same argument the government returns to on its heels. That what Mariela suffered, in the government's words, physical abuse of a seven-year-old child is somehow too trivial to constitute persecution. By any metric, this is deeply wrong. This Court has said over and over again that physical harm of an adult is sufficiently serious to constitute persecution. We cite a handful of those cases in our opening brief. The government largely doesn't engage, and we cite a handful more in our reply. And so I think those precedents give the most straightforward way to seeing the way through this case to how the agency erred when the agency concludes that physical abuse of a minor is too trivial to be persecution. Mr. Fu, can I ask you a question that may not bear on the disposition of this case, but it sort of leaps out from the record. What's the status of Mariela's parents? Do we know it? So I don't know personally. There are a couple of references in the record to how they were stopped by immigration. Yeah, there are references about past encounters, but all I can tell from this record is that they're currently in the United States. Yes, they are both present in Los Angeles with her U.S. citizen brother. But we don't know what their immigration status is. Correct. Okay. I'm sorry, I don't want to take you afield, but obviously since this young woman wants to be in the United States with her parents, I was trying to figure out what her parents' status was. Yeah, there are references to how they were stopped by immigration and put into Mexico, so it wouldn't surprise me if they had – I mean, given their experiences, I think they have totally plausible asylum claims, but I don't know exactly by what mechanism they were admitted into the country. The thing I want to emphasize here, though, is though this court's cases speak in pretty close to categorical terms in terms of physical abuse being sufficient, this is not a case that is anywhere near the borderline. Here what we have is abuse that continues for 18 months. During that year and a half, we know that Mariela comes home from school every day in tears, saying that her classmates are hitting her and beating her on account of her religion. We know that her aunt, who she's staying with at the time, goes to the teachers, asks them to intervene, and what they say is some combination – she's to blame for her mistreatment. And so unsurprisingly, when that's the response of the teachers, the abuse goes unchecked and it escalates. And so it culminates in the incident that's discussed in the briefs, which is one day Mariela is isolated by five individuals in the schoolyard. They shove her to the ground, and they pelt her with rocks until her head is left bruised and bleeding. We know that her head is still bleeding when she returns home to her aunt's house after school, and we know that she still bears the scars years later. And so if we were talking about physical abuse of an adult, a head injury to an adult that leaves facial scarring years down the line, I think that would be a pretty clear case for past persecution. When we're talking about that violence perpetrated against a seven-year-old child, it's not even close. If there are no questions about the past persecution issue, I would like to turn briefly to the question of remand, which I think is the remaining point of dispute in this case. Yeah, and I wanted to ask you about your position on that. Let me tell you what, assuming that you prevail on getting the petition granted. The IJ pre-dermitted two issues, at least. One was whether or not the government was unwilling or unable to protect her. And the other was whether internal relocation was possible. We can't make those findings. We can't even look at the record and say, gee, the record compels that conclusion. Those are findings that must be made in the first instance by the agency. So how can we determine the ultimate issue without having those findings being made by the IJ? So I think my answer is slightly different as to each. As to the government control question, I mean, we make the point in our opening brief that she satisfies this problem. The government notably doesn't dispute that. I mean, the government in their brief first doesn't dispute that the government couldn't, you know, unable or unwilling to control. But I think more importantly, the government in their brief asks for a remand in the event you find for us in the principal QP. And they don't ask for a remand on that point. I mean, what they say is essentially if you go our way on the principal QP, you should remand for the changed country conditions analysis. And so I think where the government doesn't even ask for a remand on the inability or unwillingness to control question, there's no reason for this court to give them a remand if they don't ask. Well, but if we go back on it, if there were a remand in the absence of us instructing, saying that she's established eligibility, presumably it would go back to an IJ on an open record. We don't remand one issue to an IJ. So why wouldn't we at least leave it open for the IJ to determine whether or not internal relocation were possible? So I think our position is that there's no call to do that either. And that's because the way the analysis works, right, is if she establishes past persecution, she gets a presumption of entitlement to eligibility. And this court's case law is clear. And we cite about a half dozen cases on this point at 18 to 19 of the reply that if the government doesn't make an argument on things like changed country conditions, you know, the rebuttal step of this analysis, they don't get a remand to do that the second time around. But couldn't they rebut the presumption of future persecution? So in theory, yes. But this court's case law is clear. Again, we cite about a half dozen cases to this effect that if the government doesn't try to in the first instance, they don't get a remand to try to make that showing the next time around. And it's worth keeping in mind here, the IJ asked the government attorney, would you like to cross-examine Mariela's father, the only person who testified at the hearing? And what the attorney said was, no, we're comfortable submitting on the record. So they're not even trying to make a case on this point. And this court's case law is clear that they don't make that attempt in front of the IJ. They don't get a second bite at the apple. You wanted to save some time for rebuttal. I've been watching the clock for you. Is this a good time? This is a great time. Thank you, Your Honor. I'll reserve the rest of my time. Let's hear from the government. Thank you, Your Honor. May it please the court. You know, you said for the government, the court should deny the petition for review. The court reviews this determination under substantial evidence. In order to overturn the agency's finding, the record has to not only support, but must compel a contrary finding. And on this record, the government admits that the petitioner has not demonstrated that the record compels reversal of the agency's determination. There's also another way that we can grant relief, which is to say that the IJ either applied the wrong legal standard or didn't consider certain evidence in front of him. It's one thing to discount evidence. It's another thing not to consider it. As I read the IJ's finding on past persecution, he only considers this one incident that Mr. Fu described. But the record contains evidence of other assaults on the young woman, and he doesn't seem to consider those. Am I mistaken about that? Your Honor, I would disagree in that characterization. The IJ did not consider those. In the statement of facts, as well as in the analysis, the IJ notes that the petitioner was regularly insulted and bullied. That's right, but she testifies that not only is she regularly insulted and bullied, but she is frequently physically assaulted, at least on more than one occasion. When he gets to the physical assault, he treats it as if it was only one incident. Well, I think, Your Honor, the reasoning for that is the nature of the testimony of the father on page 147 of the record, where the father is discussing what happened to the daughter. He describes how they would steal her lunch money, they would take away her food, and that she was mistreated. And he would ask, how many times was your daughter physically assaulted in Guatemala? And he says, well, when she started school, she was just – they didn't like her, but nothing physically happened to her. But the second year is when they pushed her off her chair and she got injured. And that's the focus of the IJ's analysis. I think that the agency was taking a lead here in terms of looking at what was the event that led to her being – the parents, seriously enough, that led to her being removed from school and brought to the United States. And I think that in the characterization of the father's testimony, that was the first time they were genuinely concerned about her safety or that anything serious had happened. And I think that's where the IJ was taking that, was taking the lead there and was noticing that event along with the insult and the bullying, that altogether did not rise the level of persecution. Well, in his testimony – and I'm looking at page 187 of the AR – that her classmates beat her, pulled her hair, called her names, and while she prayed and shoved her. And that doesn't seem – that seems to be different incidents than this because the aunt tried to talk to the teacher about them and couldn't remedy them. I think you're right in saying that this – the incident described in the report was the one that precipitated, you know, her stopping going to school. But there are descriptions of other incidents, aren't there? I think there are, and I think the agency could have been more explicit in identifying those experiences. But I think the language of saying that she was regularly insulted and bullied and that I think the common understanding of bullying does not just include verbal insult. It says – I'm reading the testimony in 187 – her classmates beat her, pulled her hair, and shoved her while she prayed. There seemed to be – and these were all before the aunt complains – so there seemed to be other instances of physical confrontation before this last one. Am I mistaken? No, I think – I mean, based off that declaration, yes, Your Honor, that is correct. I guess what I'm trying to convey is that I don't think the immigration judge or the agency was necessarily excluding those experiences. I think they were focusing on the one that the immigration judge put in the testimony regarding the event that led to basically her being pulled out of school and being removed. And that kind of describing her harassment and the ridicule she experienced and the bullying she experienced, I would say that the agency could have been more explicit, but it referenced that kind of experience. Again, I'm not sure if bullying is only limited to verbal taunts or anything like that. I think it might include kind of what we might understand as kind of schoolyard bullying of kind of misbehavior between students and things like that. So, again, I would just say that I'm not saying that – I think the agency could have been more explicit in addressing those experiences listed in the declaration, but I think they focused mainly on the experience that her father's testimony provided and which led to her being brought to the United States. And based on that experience and the harassment and bullying she experienced, the agency concluded that – This is concerning to me, so I want you to address it. I'm looking at the IJ's decision, and it's at AR 044. The IJ says, while I'm sympathetic to the harm, the experiences didn't arise to the level of persecution. And then he says – he addresses only this one instance. On one occasion, she was pushed and scratched her head. While the side of the bleeding did scar, it didn't result in any serious injury. Otherwise, she was subjected to regular verbal institutes and ridicule. A, it doesn't describe stones being thrown at her. And B, it doesn't analyze the other instances in which there's a declaration, at least, that she was physically assaulted. So my concern is that the IJ didn't consider – we can't tell whether the IJ considered the totality of the evidence, but rather just this one incident that Mr. Food directed himself to. I understand, Your Honor. The decisions could have been more explicit in addressing the record fully, but I guess there is that kind of presumption that the agency did consider the evidence before it. And kind of taking all that together, the agency concluded that the experiences didn't arise to the level of persecution. Counsel, let me – not much time left. Let me turn to the issue of assuming we decide this issue in petitioner's favor. You heard the exchange between Judge Hurwitz and your opponent. What's your view on what should be the scope of remand, or what kind of remand? Well, Your Honor, if you were to remand, since it was only – the decision was – the asylum claim was denied based on the rise to the level of determination. There is still, I believe, the unwilling, unable determinations you made, whether relocation was reasonable and the nexus finding, and whether or not the government had the opportunity to rebut any sort of presumption of a well-founded fear. Because the government didn't do that at the time. Because there was no past persecution finding, there was no need to shift the burden on the government to demonstrate a fundamental change in country condition. So I think the government should have the opportunity to present evidence on that. So the remand should be more open-ended, I believe. What about Mr. Fu's argument that, at least on some of those issues, the government, in effect, took a pass, you know, in effect conceded that the record doesn't support the government's position? Yes, I believe so, Your Honor. I would disagree that we necessarily conceded. We did not address them based on the fact that we understand that it might have been better for us to directly address it in our briefs, but at the same time that any past persecution finding, there's still the issue of nexus, there's still the issue of unwilling, unable, and there is the key fact of the burden shifting. If she doesn't establish past persecution, there is that burden shift to the government. So they didn't argue it at the time because there was no need to at the time. How did they know there was no need to? Did the I.J. make an oral ruling and tell them they need not put on that evidence? I keep saying he because the name is Ashley and it's ambiguous to me. Did the I.J. say no need to put on this evidence, government, or take the matter under advisement? You're right, Your Honor. I probably misspoke in saying they didn't need to at the time. I guess they didn't make the case at the time. I don't know if they're necessarily expected to make every single argument possible anticipating any future argument, and I'm not entirely sure how that kind of dynamic, entirely familiar in situations where past persecution is finding, is made during the proceedings and then does the I.J. give the agency the opportunity then to rebut it by presenting changed country conditions evidence? I'm not entirely familiar on how that would be. See, part of my problem is the I.J. says I don't have to reach these issues, and I'm not clear whether on this record the government made those arguments and the I.J. didn't reach them or whether the I.J. on his own was saying I don't have to reach them. Can you answer that, Tim, for me? I'm not sure if the I.J. I don't think the government made those arguments, but I think it comes down to the fact that the agency did present evidence, country conditions evidence, in regards to the experiences. I think there was some questioning about whether or not they were reporting to police. So I think there was discussion in regards to, say, for example, the unwilling, unable aspect of the claim. So I think maybe that's where the I.J. was. There was that testimony given and country conditions evidence regarding that, but decided that they didn't need to reach the unwilling, unable because of the dispositive past persecution plan. I think that might be where the I.J. came down on how to address those issues or not to address those issues at the time. Thank you, Mr. Youssef. Before I let you go, I want to make sure none of my colleagues have any other questions for you. I'm fine. Judge Marshall. No question. Thank you. Thank you, Mr. Youssef. Mr. Fu, you have some time remaining. It's on the clock. Proceed. Thank you. Judge Hertz, I'd like to take one more opportunity to try to explain why I think the right result here is a remand with instructions that she is eligible for asylum instead of an open record remand or a procedural remand. So I think the best case I have for this is Mimouzian. And what this court said there, and this is a quote, is, here the I.J. did not apply the presumption and therefore did not consider whether the government met its rebuttal burden. In such cases, we sometimes remand to the agency to resolve the question of changed conditions in the first instance. Under some circumstances, however, such as where the government has made no arguments before the I.J. or the BIA concerning changed country conditions, we do not remand. And so I think I think that's the clearest statement of the rule here. The government makes no arguments before, and so I think. I'm sorry. Is it a rule or a matter of discretion? In other words, so I read those cases as saying occasionally we'll exercise our discretion to tell the agency that the person is eligible. Here are the circumstances in which we might do so. But there's no rule that we have to, is there? So I think you're right that as a general matter, it's a discretionary question. But the way that at least Mimouzian states it is where the government has made no arguments before the I.J., we do not remand. And so, you know, whether the court has the power, notwithstanding Mimouzian's statement or not, I think the court probably does have the power. But at least in describing this court's usual practice, the usual practice seems to be no remand where the government has made no argument on that score. And I think that fairly well disposes of the arguments the government is now trying to salvage for a remand. And so I think the right course here is where if you agree with us that the persecution that Mariela faced is sufficiently severe to count on the asylum laws, the right course is to remand with instructions that she is eligible for asylum and entitled to withholding. And I don't think the government actually disagrees with us that entitlement to withholding and eligibility for asylum rise and fall together here. If there are no further questions on that point, I'll just close with this. The entire purpose of the asylum laws is to make good on this country's commitment to protect those who can't protect themselves and to defend the most vulnerable amongst us. And it is hard for me to think of someone who is more in need of this country's protection than Mariela. I mean, when a child is in danger, who do they normally turn to for help? They turn to their parents and their teachers. And here her parents were driven from their country and torn away from their child because of who they were and what they believed. And her teachers are condoning the very violence that's being perpetrated against her. And so this is this is exactly the type of person that the United States should be stepping up to defend. And instead, the Department of Homeland Security has decided to make Mariela a target of its immigration enforcement efforts. She has spent now half of her life in in these removal proceedings. And this court should should put her on search and it should grant a petition and remand with instructions that she is eligible for asylum and entitled to withholding. Thank you. Thank you. Do either of my colleagues have any other questions for Mr. Fu? I'd like to ask him a sort of off point question, if I may. All right. Judge, you may do whatever you want. Well, Mr. Fu, you're taking this case pro bono, right? Correct. Can I ask you what your usual line of work is when you're not doing pro bono? I'm an appellate attorney. Appellate? You're with OREC? I am. OREC has something of an appellate practice, at least. Is that right? It does. Yes. I see. Have you handled immigration cases before? I've handled one or two immigration cases before this. I see. All right. Well, I was just curious. We all just we, of course, appreciate your pro bono efforts, however this case comes up. Thank you. Thank you. Thank you. This case will be submitted on behalf of the court. I thank Mr. Fu for taking this case on pro bono. I thank both counsel for their excellent arguments and briefs. And we'll call the next case on the calendar.
judges: Tashima, Hurwitz, Marshall